Good morning, your honors, Andrea Miller for Appellate Mario Moreno. This case, as you know, is about the demolition of a home. It was originally in 1910 built as a grocery store, kind of a little neighborhood treasure from some of the declarations in the record. Mr. Moreno, who was a gardener, but had lived his life in the neighborhood, attempted to rehabilitate the house into a home. And had gotten, according to the record, about 90% there, had remedied everything about it that made it in the least bit dangerous, if anything ever had, and then it was knocked down because he had taken too much time. So this case, at its heart, from my perspective, has always been a due process case. It's a question of whether the government can hold hearings at one point about the status of a building, put a label on that building, and never look at it again, even though the owner has done, in this case, I think in the record it shows something like $24,000 worth of work, replacing everything, and still say, well, you didn't do it fast enough. We decided you were out of time, even though it's not dangerous anymore. And in the record, in the deposition excerpts that I gave you, it shows you that the city of Sacramento inspectors don't consider a building off the dangerous building list until they can give it a certificate of occupancy. The depositions will show you that that means the kitchen cupboards have to be up and painted. If there were carpets on the floor in the plan, there need to be carpets. If there was tile to be on the floor in the plan, there has to be tile, or that house can still be knocked down for failure to complete it. The problem here, of course, is when we're talking about residences, there are hundreds of thousands of residences where once an inspector got inside, they might find this house built in 1930. But this wasn't a residence, was it? Do you get a hearing at a meaningful time? But first we ought to address the Williamson issue that was raised through Pacific Legal Foundation's amicus brief. Judge Levy swept all the claims into the Williamson analysis and found them to be in unright because the inverse had to be dealt with first. As we know, the final decision element of Williamson is no problem here because the property was destroyed. It's only the exhaustion of an available state remedy that would retard this case from being ripe under Judge Levy's analysis as well as other courts' analysis. Customer company of Sacramento mentions in no less than eight places the issue being eminent domain is what is found in the Constitution of the state of California. Inverse condemnation is just the flip side of eminent domain. It has been extended to some degree to public projects, but they will not extend it to cover acts by government employees effecting other plans besides public projects. Isn't customer a little bit different than our case? Well, because it has the police activity in it. Well, part of it. I mean, it was negligent conduct when they used the tear gas to evacuate the building as part of their law enforcement activities. Here, this was a deliberate attempt, deliberate decision to knock the building down. I understand what you're saying, and I don't disagree with you, but the problem with customer is that the Supreme Court could have merely said that, exactly what you said. It could have said all we have here is a police activity that maybe got out of control. Well, there are California Supreme Court cases that seem to recognize that when there's deliberate action by the state officials or local officials, for that matter, that you do have an inverse condemnation action. Well, I didn't know about your rule that if I were going to mention other cases to you, I had to bring copies of them, so I can't tell you about them, but I'm sure your clerks have already found them. There are follow-on cases from customer where the courts have literally said, unless it's entity deliberation that is regarding a public work or the confiscation of property for a public use, it's not with an inverse after customer. Does that ultimately matter under Williamson? I beg your pardon? Does that ultimately matter? In other words, does it matter under Williamson? Does the action, does the state remedy under Williamson have to be an inverse condemnation action as opposed to something? I think it has to be reasonably congruent with the Fifth Amendment remedy or it's a meaningless remedy. And customer itself points out that there really is almost no congruence between a negligence action and inverse action in terms of the scope of the remedy. On the one hand, it gives you less because you can't do the emotional distress and so on. On the other hand, it gives you a great deal more because if you prevail, you get the attorney's fees and you get the cost of the experts, which is really the principal part, even in the case that we did in terms of out-of-pocket costs, is hiring those people to assess values and that sort of thing. So there really isn't a plus in a negligence action. There are all kinds of defenses that you couldn't raise in a constitutional action. Did this employee who did the act have discretionary authority to decide on his own whether to act or not to act? If he did, he's immune. You know, it's just the immunities are very, very painful when you're trying. And then the question is, if you're limited to negligence, you can't hold the city through the negligence of the you can hold it through the intentional acts or through the constitutional acts of the employee. There doesn't seem to be a California case, if you can point to, that says that Mr. Moreno would not have, clearly not have, an inverse condemnation action. Only the one that I can't tell you about. Tell us about it. It's just a case named Peterno v. California. It's a 1999 appellate court case that, in summary, the citation is 74 Calat 468. And at 87 and 88, they talk about there can't be a taking for the act of an individual employee. There has to be entity deliberation. Wasn't that what we had here? No. The city followed its building code procedures. No. For condemning this building. Finding it to be a dangerous building. It followed a set of rules and procedures. And eventually entered into this agreement with him. Well, many years before. Well, the agreement was not many years before. Oh, I understand that. And the problem with the agreement, you see, is, first of all, Mr. Moreno was told if you don't sign the agreement, we're going to knock your building down today. Sorry, I didn't hear that. If you don't sign this agreement, we're going to knock your building down now. Right now. But they didn't do that. They gave him 24 hours. They gave him 24 hours. That's true. And he tried to go get some help and found out that he couldn't afford to get the help. That the lawyer said, you're not going to be able to pay me for this and still take care of your building. Just go take care of your building. So that's what he did. In his own mind, he believed he was already 80% there. And so when they saw everything, when they came in and inspected and they saw everything, he would have very little left to do. And he was pretty much right. He put a new roof on. He trained it. He changed out all the electrical. He changed out all the plumbing. He changed out everything in the building. The last thing he had left to do was this air conditioner, and he couldn't afford to buy it. And someone bought it for him, and that's it on the record, in early January, and began to install it. And there were two ducts left to get connected when they came in. And the problem here is real, and the reason I say this is really due process and we would like you to look behind customer in any event, the problem is the man had a permit at that time. He had the day they destroyed his building, as far as he knew, he had a permit. He had done all this work and had been signed off over a period of two and a half months. I thought there were California cases, to go back to the earlier question, although I find it odd. Which provide, which treat as a taking and provide compensation for essentially an overreach of a nuisance. In other words, a document sent down as a nuisance, which isn't really a nuisance. Is there no California law on that? I have not seen it. Perhaps Mr. Kroeger, who is, you know, would love to find some, can share that with you. But I haven't seen it. The reason it seems odd to me is because it seems to me if you knock down something as a nuisance, I don't know what the public purpose is. But my sense is that it is treated that way. Sinaloa, for example, was that, essentially. And that was brought into federal court. And I think that's probably the problem. I think that probably the problem is those cases had typically been brought into federal court because they're very difficult to bring into state court for a whole lot of political reasons. Which is why we have 1983, right? So that's how it happens. I think you saw far more of that than the California courts did, quite frankly, unless it was very clear. Well, there is one California court of appeal case. It's somewhat analogous, and that's Rose v. City of Coalinga. Rose v. City of Coalinga was decided just immediately before Hussler was decided. That's correct. I don't know what happened to Rose. I actually tried to call the lawyers in that case. And because of the Thanksgiving holiday, I couldn't reach anybody. I don't know what happened to Rose. You know, it went back for trial, and I don't know whether they then dismissed part of it because of customer or not. I have no idea. Well, Rose was decided, at least the California court of appeal decision came down in 87, and customer came down in 95. Oh, I'm sorry. I'm thinking of a different one. In any event, there are a few California court of appeals. My only point was that I just can't seem to find a case that says you don't have a remedy under California law for purposes of the Williamson exhaustion requirement. Just what I told you about. Now he's got them. There were two others, one that said police power action doesn't constitute inverse condemnation. That was specific Bell v. City of San Diego decided in 2000. And I do have the copies now if you'd like me to pass them to you. It was 81 Calat 4th, 596. And then there was one more in 2002 that is not as clear, but it's there, Lutter v. California, 94 Calat 4th, 1285. It says that employee acts unrelated to a public project must be tried as a tort, not as an inverse condemnation. But if I could, I'd like to move on to the due process aspect of the case. Judge Levy. I think Judge Levy had a question. I'm sorry. Well, your position with respect to the agreement is not clear to me. You attack the agreement on the one hand, and do you rely on it to any extent at all? I rely on the permit, the actual permit that was issued by the city of Sacramento. But the agreement that he entered into. You do not rely on it for anything. And, as a matter of fact, you say it was extortion or something short of that is invalid for a lot of reasons. Am I right? I believe it's invalid for a lot of reasons. And if it were invalid for a lot of reasons, I would still think that self-help, which is what they professed below. We had a contract. He didn't fulfill his end of the bargain, so we got to knock the house down. That should have, at least they should have had to show that he actually didn't fulfill the contract. And then you also asked to amend to include an inverse condemnation claim, do you not? I wanted one of two things from the judge. I wanted him to either sever out the Fifth Amendment claim if he thought that was deadly and he wouldn't bring in the inverse claim or bring in the inverse claim, one or the other, because I really thought it was a due process claim. But in any event, you're before us saying that no inverse condemnation remedy is available under California law. That's what Pacific Legal Foundation briefed, and I quite frankly had not been aware of it, and now it appears to me that they're right. And that's your position now? Yes. All right. But assuming that you disagree with that, and that's very possible, there's a problem in my mind with the sweeping of all Federal claims and all constitutional claims, no matter what, into this taking, elevating the concept of state exhaustion on a taking concept to lock out search and seizure questions, to cause you not to look at all at the procedural due process, and to not look at all at the quality and depth of the conduct of the officials involved, is a frightening concept. So what ultimately is the standard that you would suggest that we adopt with regard to, let's assume that we thought the procedural due process issue was not properly looped over to Williamson. What we have here is a sort of odd situation, because there was an awful lot of process over the years. But your issue is really when, at what point can they say, okay, we've given you all the process we're going to give you, and we're going to knock down the house if X doesn't happen, or do they still have to provide more process? You asked about three questions there. I probably did. My fundamental question is, what standard or rule are you arguing for in a situation in which there has been notice and an opportunity to appeal on whether the house is a nuisance, in fact, several times? At the same time, there has been a change in circumstances in terms of the status of the house. I mean, that's the problem. And so what is the city supposed to do prior to knocking down the house? When and how and what? I think that the Miles case talks about it, the D.C. case, and I believe there was one other case that talked about it. Essentially, the problem comes up because the city says you can repair it, the person undertakes the repair, they either don't have sufficient money to do it in the time involved, but they're diligent, they're moving along, they're getting things done. And in this case, 90% of everything is a whole lot of getting things done. I think at the point that they do the work, in other words, the cases that we're used to seeing in these demolition cases are cases where the order is made and people disagree with the order, but they don't do anything. They just disagree with the order. And then the building gets knocked down and they come back and say, well, you know, they shouldn't have done it. Once that permit is issued and once that person takes steps under that permit, which the HCAAB order allows them to do, and they put in time and they put in money and they put in effort and they change that building, there needs to be another opportunity. That's why I gave you the citation in the brief, which I'm not going to have in front of me right now, on the ordinance that allows them to go back to the board. They say that's wholly discretionary, but clearly the city realized if someone starts to work, because that's what the limitation is on that ordinance, when work has been done under the, after the order, under a permit, and hasn't been completed, you can come back to the board. Quite frankly, I, you know, I read that four times and thought they've got to mean you should come back to the board, but they only said may. And that's what I think needs to happen. The other thing is I think a Cleveland Board of Education versus Loudermill kind of situation when you've got serious. The whole goes back to the board. The building owner goes back to the board. No, well, the building owner doesn't know what's going to happen when they sneak up on him like this. But before the person in the field can do what was done here, they have to give him notice and let, and take it back to the board and say now we're going to cut him off. We can't do any more. I would like to reserve. Well, y'all just answer judge, you'll get your time. But the problem I see in this case is you're saying that the city should have done something more because he was fixing it. And then. Okay, excuse me. And at the same time, you're saying they have no right to know whether or not he's fixing it because that's a violation of his Fourth Amendment right for them to go and try to find out. And he can do all this without ever notifying the city that even though he's beyond the terms, the time allowed by his building permit, he's outside that time. He's in effect now saying to the court, nobody can look. And yet they should have gone back for another hearing. Isn't that the posture we're in? Boy, I didn't think so. Okay, but what's wrong with that? I'm not saying that they couldn't come by and inspect. But you have to understand what happened here. What happened here is they came by with a bulldozer. I know that. But you say they shouldn't. They didn't normally just drop in. That was not what they did. No, I know that. They didn't need to call for an inspection. Certainly if they had said to him, we think you're running out of time here or we're going to call you out of time, we want to come and look at your building. Or if they followed the warrant procedure and given him that notice and he realized that they're not, they're not. They haven't analyzed what I've done here. They don't realize I'm done. They've seen everything but the air conditioner. I've told them about that. But that's all they had to do. If they had gotten the warrant, he would have had time. If they had gotten the final letter, for God's sake, that the city attorney, who was the last reviewer, he told them to send it and they told a lie to avoid sending it. If he had gotten that letter, it would have been enough. He could have instituted his own effort to clear things up. He could have gotten someone else just from the city administration out besides this inspector and said, you know, you need to look. Do you really want to knock this building down? But they snuck up on him. Right. There's – maybe this is just a variation of Judge Brezan's question. But essentially what you're saying is that even though there was a final notice here that the building was dangerous and unsafe. The final notice being the agreement? No, no. Well, I guess it was just before the agreement. There was a final notice. 1999. There was a final notice here at some point. There had to have been a final notice. They never could have knocked the building down. I'm sorry. I did disappoint you. No, there was a notice at some point. There was a notice at some point along the way that was final that was never appealed to the administrative process when the building department found the building to be unsafe and dangerous. That was 1999, the one that he thought he had appealed because he also got hit with something. Well, he didn't appeal it. He later appealed a penalty that was assessed for not compliance. But essentially what you're saying, though, is once the city issues that – even though there's that kind of order in place, that if they allow any kind of significant repair work, that notice is no longer enforceable. I believe that. By allowing him to repair, they have – I'm putting aside the agreement for a moment. Right. By allowing him to repair, issuing him the building permit to repair, and he does work, they've waived their right to enforce that final notice. Well, the final notice only says you have 60 days to do X, Y, or Z. Then they issue the permit. Right. Then if he does work and they do inspections, they don't pull the permit. That's the way it works. Well, let's say he's got the 60 – wait a minute. I'm trying to understand this. He has the 60 days to do the work. Right. And he has a list of things that need to be completed. Well, let's say he does half of all those things. He doesn't do it all. Well, I don't know. Let's just do it half. Okay. He does half. Right. And they say, well, the building's still dangerous. You would say they still can't knock it down. They have to give him a new hearing. I would say they have to at least give him notice. He may choose not to file a notice. They at least have to give him notice. They have to tell him. They have to tell him. So does he have any right? Once they tell him we're knocking your building down, you didn't complete the work, do they have to do anything else? I don't think so, no. They could just knock the building down. If they had done that, if they had given this man notice and he had chosen, even though some of the cases say you don't have to do this, but he had chosen not to go to try to get some independent help from a court to say, wait, my building isn't dangerous anymore, now they're just fooling around here because of some technicality, I don't have a dangerous building, and stopped it and gotten an independent look at it, that, you know, maybe he'd have been out of luck. I don't know. So you're arguing, therefore, this is where I was at the beginning. So your argument is that all they had to give him was notice, not a hearing. A notice and an opportunity to be heard is the way the rule reads, is it not? Notice and an opportunity to be heard at a meaningful time in a meaningful manner. But that's different than what you answered Judge Payas. But that's different than your answer to Judge Payas. That's different than your answer to Judge Payas. It would be helpful to me to know what they should have done. They should have given him notice, and then he would have had an opportunity to try to get a hearing. But the opportunity to get a hearing. But that's saying that he should have then given him – he would have then had an opportunity to get a hearing. You're right. He could have gone to State court and sought an injunction. But I would – I imagine you would argue that's not meaningful. That's too cumbersome. Well, I'm not sure. He could have gone to the HCAAC. According to the testimony of the people in this case, if he had gone to them and asked for an HCAAB hearing, they would have had one. But they don't tell him that they're going to tear the building down so he doesn't know he needs one. There is testimony in the record to that effect. Well, if he had called and said he wanted to have a hearing, we would have given him one. Well, how does he know to call? He thinks he's done. His understanding is – Would they say they would have given him a hearing, but do they have to give him a hearing? Well, I think when he applies, according to them, none of this is in any of the rules, right? But according to them, if he requested a hearing, it would go on their agenda. Now, would they give him relief? I don't know. Okay. So is your position then – and I'm sorry, I'm just trying to get clear what is you're asking for. Is your position that they should have written him a letter, essentially, that the city attorney said they should have written him? Absolutely. And that after that, it would have been a sufficient due process that there was the availability of a court proceeding if he went to court? Is that basically your position? If it's a sufficient due process, that would be my position. All right. So all you're asking for is that there should have been a letter written to him before they – and I don't mean to minimize this. I mean, it could have made the difference. But I'm just trying to get clear on what your argument is about what process was due here. It's sort of – yeah, it's sort of like the difference between somebody honking their horn and trying to avoid you and somebody driving straight into you. I mean, at least you get a clear chance to escape the effects with one and not with the other one. It was so sneaky. And that's the substantive due process that I understand how you're probably going to view that. But to imagine that they went to such lengths to avoid letting him know, and therefore – I mean, even when the city attorney says in the final letter, I gave you an example of that, it's supposed to say – when he writes to them, he says, send the final letter. And then if you hear from the owner or representative, stop your proceedings. Stop. Don't demolish. Let them get a chance to say what they want to say to me. When that final letter goes out, of course, it doesn't go out. Nobody knows to do that. Then when he does call someone and that lawyer calls the city attorney, the city attorney says, wow, let me look into it. I don't know what's happening. He calls the very man that started this sort of thing who was on the site and says to him, I have a lawyer calling about 1915 48th Street. Tell me what's happening. And Mr. Pino says, gee, I don't know. I'll have to check. He's there. And then after it's over, they call the lawyer and say, oh, we're sorry. It's too late. It's down. The lengths they went to, to avoid allowing him to have an independent viewing of that building and an assessment, an appropriate assessment of its status at the moment they decided to destroy it, tells you something. Okay. Thank you, Counsel. Good morning, Your Honors. Tom Krager representing the police. There are a number of issues which were briefed and raised on the appeal which have not been addressed by your comments today. And I'll ask if you would like me to address the issues that you've been raising here with Ms. Miller or if you want me to address some of the other things. All right. Then, Your Honor, I will address then the issue of, start off the issue of qualified immunity for the individual defendants. The trial court found that on both the search and seizure claims of the Fourth Amendment, they were entitled to qualified immunity. I believe it is adequately briefed in the moving papers, but there are a number of cases on the search claim which indicate that, from other circuits, which indicate that there is a substantially lessened expectation of privacy in a building such as this, which is not a residence. No one's living there. It's under a notice in order to either repair or demolish. Well, there certainly isn't generally a lesser interest in privacy in a commercial building. That's not true. I mean, as a general matter, you need a warrant to go into a commercial building. Well, Your Honor, this is more than just a commercial building. This is a building which is subject to a notice in order to repair or demolish, which is subject to a building permit which requires inspections, which is subject to an agreement between the City of Sacramento and Mr. Moreno, which calls for inspections. When they inspected, though, under those notices and orders and whatnot, did they always call up and say, we need to come down, it's time to, you know, we need to have you over to inspect our work? No. And they'd go and inspect? That's not true. Or were they free just to show up and they saw fit, walk through the place and say, still in bad shape? They're free just to show up, and it's in the record in December of 2000, Mr. Vanella, the primary building inspector, after not hearing from Mr. Moreno for some lengthy period of time with respect to any inspection, went to the structure and found that it's still not in compliance with either the notice, the then-existing notice in order to repair or demolish, or the agreement which called for. Did he walk in there on his own and just sort of walk through and take it? He walked in there on his own, and there was no other people, there was no one there. You know, the building to be in, someone's putting up a building, they go to the city and say, please give us a permit, you're going to come and do these inspections so that I may continue in an orderly process to put up my building and comply with the regulations. They invite the building inspector to show up. That's essentially a consent argument is what you're saying, and that may be right, but that isn't what they were doing here, is it? That's exactly what they were doing there. Mr. Vanella, the day of the incident, with respect to the search issue, there's a distinct claim, a violation of the Fourth Amendment of an illegal search, as opposed to a seizure. A search for he was entering to inspect for compliance with the building permit. That's right, Your Honor, and it is in the records at the supplemental S.E.R., supplemental exert record, page six, basically page six through 11. Mr. Vanella went into the structure immediately before the demolition and determined that there were numerous failures to comply with the city codes, including codes involving plumbing, ventilation, and electricity. Now, he hadn't been requested to come out and inspect the building on that day. He had not been requested to come out and inspect the building on the day of the demolition, nor had he been requested to inspect the building on other occasions, to include December of 2000, when he went out because he hadn't heard anything from Mr. Moreno, and he went out and determined that work was not progressing as required, either under the notice in order to either repair or demolish, or the agreement. In taking down the building, the city did not rely solely on the agreement. In fact, they relied on an existing notice in order to repair or demolish. Ms. Miller points out that the last such order was from 1999, and that's simply not accurate. In November of 2000, at a hearing regarding the administrative fine, findings were made that the building remains out of compliance with the then existing notice in order to repair or demolish. That's the 1999 order, though. The 1999 order, but in 2000, November of 2000, a factual finding is made, and Mr. Moreno is also informed at that time, in writing, that he has a right to appeal that finding, and he does not do so. So we have, subsequent to the order of 1999, we have any number of instances where— But in the end, this is what's, of course, disturbing about this case. In the end, when the inspection was done legally or illegally on the day of the demolition, the finding was that there was not full compliance with the building code and the building permit, but there was no finding that the building was a nuisance at that point, which would have merited destruction given its state at that time. Your Honor, by definition, a building which is out of compliance with the applicable safety codes is both a nuisance and dangerous. You mean if my house has an electricity that's out of keeping with the building codes, you can come knock it down? Well, technically, yes, after you were given notice and opportunity to be heard, which Mr. Moreno was given in spades. Where do we find the rule that any noncompliance with the building code is sufficient to make a building a nuisance and destroyable? First of all, the distinction has to be made between any building at all. Say, for example, your home, which you're currently living in, a building inspector shows up and says, I want to look at your electricity. Oh, gee, you've got a wire off. I'm going to knock your building down. That's different from a building which is undergoing repair. Well, I understand that. Which from 1995 on has. . . But that isn't what I asked you. What I asked you was, was this building, was there any finding that the building was in a state on January whatever it was that would have merited knocking it down if that was the beginning of the problem? I hate to answer a question by a question. Finding by whom? By anybody who inspected it. Was the inspection for that purpose, or was the inspection simply that it was out of compliance with the building code? Mr. Vannella determined on his inspection, and it's reflected in his declarations which are in the Supplemental Excerpt of Records, that based on the state of uncompleteness of the work, the building was dangerous as defined by the codes, both the Sacramento City Codes and the California Health and Safety Codes. So there was that determination made, and the building was under a current notice in order to repair or demolish, which had been found in November of 2000 that had not been complied with. So that's the best way I can answer your question, Your Honor. But all of the building permits and the agreement, as a matter of fact, that you rely on to permit inspections, they had all expired, right? The agreement by its terms had certainly not expired. It required action by Mr. Moreno within a certain period of time. That time had expired? That time had expired. But it had not expired to the extent that it allowed the city, upon his non-performance by the terms of the agreement, to move ahead with a demolition. Well, you know, the agreement doesn't exactly say that. The agreement says that upon the expiration of the time they will have their legal remedies, but that doesn't really tell you whether there is some procedure to do before that. I believe, Your Honor, it says, and I don't have the agreement in front of me, but I believe, Your Honor, it says, have all legal remedies up to and including demolition. And the previous notice and orders throughout the years. But it doesn't say without the need for any further notice. No, but the various notices and orders to repair or demolish inform the persons receiving that that if you fail to comply, your building may be demolished. In fact, some say will be demolished without any further notice to you. I guess, you know, what's disturbing, frankly, at the bottom of all this is that it makes no sense. Why would the city want to do this? As opposed to having given him the opportunity several different times to continue to repair it. And he was, in fact, trying to repair it. There's something about this case that's disturbing because you can't figure out why this happened. Because at some point in time, the city has to be able to act. Any municipality has to be able to act. If you use Ms. Miller's logic and Mr. Moreno's logic, he could do a little bit of work and say, oh, no, now we have to have another hearing. They come in and say you're not in compliance. You could go and do a little more work. And ultimately what she said was all we really wanted was a notice. What about that? He received notice that if you do not complete all the required construction, your building will be demolished without further notice to you. He also was inspected at some period after that 60-day had expired. And he wasn't told at that point, stop working, we're going to knock down the building, because the time lapsed. There was at least an implication, more than an implication, that he could continue to work. Well, he did continue to work. Right. But up through January 31st, when there is another inspection to determine the state of repair, Mr. Vannello, the building inspector, finds substantial deficits in the repair, violations of both the city and state codes. And it is a dangerous and substandard building at that point. That's somewhat disturbing. To some extent the city leads, you know, the homeowner or building owner along. That is, they let him, apparently let him, they issue permits after permits have expired. They impose fines. They still issue building permits. And he invests a substantial, apparently, she says $24,000 into the building, which is no small amount of money. The homeowner attempts to repair it to bring it into compliance. The alternative would be to then say you have six days to repair or demolish. If the homeowner is unable to do it for any reason, tough luck, we're going to knock your building down. Well, what's wrong with giving him notice at the end, a final notice? Your Honor, I don't think there's anything, quote, wrong with it. The question is, is it required from a due process standpoint? And my point, it is not, because he had been given notice after notice after notice. And if you do not complete this work within specified periods of time, we will knock your building down without further notice to you. Where in the record is Mr. Vannella's last finding that the building remained dangerous? It is in the record at the supplemental excerpt of record, pages 6 through 11. And, Your Honor, in the factual background section of the pleadings, or excuse me, of my brief, there is an attempt, at least, to take a step-by-step of, in 1995, this is the notice, 97, 99, 2000, step-by-step-by-step. And what we see is a progression. He's getting notice as he's being told you have to repair or demolish. Those findings are being affirmed. He's being given fines because he's not complying with the notice. So when he gets a fine, it's not just because he's dilatory. It is because it's dilatory. But there's also findings that in addition to you being fined, you're not in compliance. The building remains in nuisance. All of these are subject to appeal. If Mr. Vannella had found when he went in on a day in January that the building was no longer dangerous, although not in compliance with the code, then presumably they wouldn't have knocked it down? He could have. He could have, depending on what he found. If we were to set up a hypothetical. Then it turns out that the final demolition decision is turning on a factual determination as to which, it's not simply because he hasn't complied previously, but on a factual determination as to the state of facts at that time, as to which he hasn't given notice or an opportunity to say anything. No, Your Honor, that's incorrect, and here's why I believe so. The finding by Mr. Vannella that there was noncompliance with a previously issued notice in order to repair or demolish. In other words, there were findings. He already knew that on December 12th, right? Because on December 12th, the time had already run out and it hadn't been complied with. Right, and then there was another 45 days and it still hadn't been complied with. So at what point in time does the city say, we're going to give you a little more time? They've been giving this fellow a little more time for five years. I understand that and I think you have a lot of equities on that side, but what I'm trying to understand is there was still, as you're describing it, a factual determination made on that day in January on which the demolition actually turned. That's correct. A factual determination by an expert building inspector. With no notice. With no notice. Granted, with no notice that the owner had failed to comply with the orders which had previously been issued, which demarcated what needed to be done that hadn't been done. Now, how else would that determination be made? Well, you see, this is what's strange. If your position was it doesn't matter what the state of that building was on January 30th, 2001, because he had failed to comply and were entitled to knock down the building, that would be one thing. Then all the earlier notices may have well been sufficient. But that isn't your position. Your position is it did matter what the state of the building was on January 30th, 2001. It certainly does matter what the state of the building was in 2001 because the state of the building was noncompliance with previously issued orders to repair or demolish. But not simply because the time had run out. No. You're not relying on the time running out. We're not based. The city has never based its decision solely because when you say the time had run out, that's for the contract. But the problem is the time running out is key to compliance with the repair or demolish. In other words, you have 60 days to do something. And they didn't do it. But they didn't do it. So I can't come in and say time has run out and do it in a vacuum without looking at the building because the activities that have to take place within that specific time relate directly to the condition of the building. So the condition of the building would always matter. But that time had run before the December 12th inspection. Correct. Right? So we know that on December 12th there was noncompliance. But you're not relying on that noncompliance. We're relying on noncompliance on December 12th, December 13th, 14th, 15th, all the way up to January 31st when there was still noncompliance. So let me ask you this. Yes, sir. Mr. Marino didn't even have the right to have notice to get his personal items out of that building before it was demolished. That's your position? No, that's disputed, in fact. Well, I mean, why wouldn't you notify him? Look, we're tearing down this building in 48 hours or 24 hours. Get in there and get all your personal belongings out of there. There was information received by the city attorney's office in the building that if notice was given regarding the demolition, that there might be a problem, whether that was good, bad, or indifferent. Wait a minute. Was notice given? No, no. No notice was given. I didn't claim notice was given. Because it would be a problem if they gave notice. Yes. Meaning what? That he would go into court and get a temporary injunction or something? No, that the information they received was that Mr. Marino might do something harmful. Might do something harmful. Oh, I see. Now, whether that's good, bad, or indifferent, with respect to the due process issues, it's unimportant, because he had notice and opportunity to be heard all the steps along the way. And if you had personal tools in there or you had supplies that you were going to be putting in the building, wouldn't you like to have notice to get it out in time? He did. When did he get notice the building was going to be knocked down on January 31st? On the 31st. And they were given time to remove the objects. And, in fact, they removed objects. Is that not true? Pardon me? 20 minutes? That's disputed, Your Honor. You know, we have people saying 20 minutes. We have people saying substantially longer. Well, if all this is disputed, shouldn't we be having a trial and a procedural due process question? On which? Substantive or procedural due process? Procedural due process. Procedural due process. Well, potentially, but then you run smack into Williamson. Explain to me how the procedural due process issue runs into Williamson. Because the procedural due process issue deals directly with both a question of what pre-deprivation due process he's entitled to and what the condition of the building was and what the proper scope of the city, the city has to demolish a building. So all of those things are intertwined. And under Harris, under Harris, ruling of this Court, that when you have a procedural due process issue which is intertwined with a takings issue, the issues raised in the takings issue, the Williamson exhaustion applies. The same remedies or same damages for a violation of an inverse or for prevailing on an inverse condemnation claim as he could on a violation of a procedural due process claim under Section 1983? Excuse me. On the inverse condemnation? What relief can he get on inverse condemnation? He'd get damages to the property, and under the Code of Civil Procedure, he can move for attorney's fees and costs. Okay. Which would be similar to 1983. And on a procedural due process violation, what would be the scope of his damages? It would be very similar, then, Your Honor. Anything else? On a procedural due process, that's an interesting issue because our point would be that for destruction of property only, he would not be entitled to any emotional distress damages. You're only talking about violation of his constitutional right. But it resulted in a property loss only. And so there would be an issue about whether or not he would be entitled to emotional distress damages. Certainly he'd be entitled to, if he were successful, he'd be entitled to make an application for attorney's fees under 1988. So there is a somewhat of an equivalent. How about loss of personal property? Loss of personal property, certainly. Can you get that under inverse condemnation? Yes, you can, both real and personal property. How about collateral damages like lost investment costs? Not to my understanding under inverse condemnation proceedings, Your Honor. But those, I have a red light now, if you'd like me to adjust. No, just. Those would certainly be available under a tort remedy, which under the customer care case, under the California Tort Claims Act, is in fact available. Either for negligence or, I suppose, in an issue such as this, one could even craft a claim for trespass, which is a tort. Does he have an inverse condemnation claim? I believe he does, Your Honor. And the reason I believe he has an inverse condemnation claim is that the customer care case, at the very beginning of the case, and I tried to point it out in my response to the PLF brief, very succinctly describes what they're deciding. And what they are deciding, in the circumstances of that case, where you have, and you pointed it out earlier, what is arguably just negligent conduct, which results in an unintended consequence of a partial destruction of goods and partial destruction of the building and in an exercise of truly police power in that they were in hot pursuit of a criminal suspect who barricaded him in the building, that there would be no inverse condemnation claim and that the sole remedy would be under the California Tort Claims Act. I think we have to distinguish that from the facts in this case and where we have a specific act intended to enforce, excuse me, health and safety regulations. It wasn't negligent. It wasn't the whim of a single person. It wasn't a decision that was made on the spot. It was the result of a process which had been going on for five years, notices and orders to repair or demolish, et cetera, et cetera. The question I have, which may be a little out of left field, but it's been bothering me. His allegation essentially is that they knocked out a building that was not a nuisance, right? If it were a nuisance, then you wouldn't have to compensate, right? If it were actually a nuisance, there's no just compensation. Correct. A nuisance or, you know, in some cases an emergency, but in this case a nuisance, yes. Okay. So his allegation is, though, it wasn't a nuisance. If it wasn't a nuisance, then why is it taken for public purpose at all? I'm wondering why an inverse condemnation cause of action would lie for taking property that is not a nuisance, for knocking down a building that is not a nuisance. What's the public purpose of doing that? So the question is will an inverse condemnation lie if you exceed the proper scope of the police power to demolish a building? Okay. And I think the Rose v. City of Coalinga case, along with House v. City of Los Angeles, or pardon me, I think it's the Los Angeles Flood Control District, answers that in the affirmative that where a taking or the seizure or demolition is unnecessary, they use the terms unnecessary or unwarranted, given the facts, then a cause of action inverse condemnation may be appropriate. Now, the governing body, the governmental entity, would still have the defense to an inverse condemnation action to say it was a nuisance or it was an emergency. Right. But until that's determined, then you don't have the exhaustion of that potential remedy. Similarly, you don't have the exhaustion of a tort claim. That's where I believe the... Why couldn't he have a cause of action in federal court that says this was a taking not for a public purpose, therefore it violates the Fifth Amendment takings clause, not because I want compensation, but because it was not for a public purpose. So you would have a... And if I understand... I'm just curious about this. It doesn't seem to be the way the world works. If I understand the holding in Armendariz is that if the allegation is it's not for a public purpose... Right. ...then you don't have to go through the exhaustion issue. Isn't that essentially what he's saying here? He's saying you took it, but it wasn't for a public purpose. No, because... What's wrong with my building? Because the... And we look at... And we have to look at... I think that Armendariz is the perfect case. In that case... Well, it was a private taking. I understand that. Right. Right. But here it is for a public purpose. It's for public health, you know, the health, safety, morals. Even if erroneous. So essentially what you're saying is that the breadth of the public purpose doctrine under Berman and everything else is such that even if they're mistaken, it's still, as long as they think it's for a public purpose... I mean, you may be right about this, but it's just odd. It is. I believe so, Your Honor. And especially when you have a code section set up both within the city and within the state, which allows for inspections, the proceedings, all the procedures, appeals, both to administrative appeals. It could have brought a writ of mandate. You have all this procedure built in to lead to the point where a building can be demolished. But it can be demolished because it's dangerous or a nuisance under defined codes. Because the city thinks it is, even if it's mistaken. And if it's mistaken, then if they exceed that police power, then potentially the affected landowner has a cause of action either in tort and or in inverse condemnation under Rose and House. Anything else? Thank you. Appreciate your argument. One minute. We've been very generous. A couple of things I just want to point you to. I would like you to look in the record at 254, if you have not already, which is the hearing of a decision of a hearing examiner that the city contends is a hearing for purposes of establishing a dangerous building. And I suggest to you that you will not see one evaluation of the status of this building in this order. And, in fact, right behind it there's a supplementary order where the fine was reduced. These hearings are to recover the costs of administration. These hearing officers have no power whatsoever to relieve the homeowner of the dangerous building rubric or anything else. Also, please don't be deceived by the long fax in the original brief. The administration of this building that was done before 1999 was done in the hands of another owner. You know, it's like Mr. Moreno owned it. Well, they eventually gave Mr. Moreno the notice. Got a dangerous building. You've got to correct it. Right. Oh, no, I agree with you. Start all over with Mr. Moreno. How about years and years and years? What we're talking about is a notice in late 1999. That's what we're talking about. And, finally, it's very upsetting to hear Mr. Crager stand here and tell you that the reason Mr. Moreno was not given notice was because there was some imminent, some suggestion he was a dangerous human being. That is a horrifying thing to say when there's nothing in the record. Okay. In fact, it doesn't say that in the record. In fact, we asked about that in deposition. And, in fact, everybody denied finding him to be anything but the most cooperative and benign of people. And to bring that up in this kind of a hearing after we've gone through all this is really, really upsetting. Okay. Thank you. And it's the course of conduct that's gone on here. All right. Thank you. Thank you very much. This matter will stand submitted. Thank you.
judges: Leavy, Paez, Berzon